Carolyn M. GAUMER and Harry Burris, Executors of the Estate of Alice U. McDaniel, Plaintiffs,

v.

Richard D. McDANIEL, J. David McDaniel, John E. Hughes, and The First National Bank of North East, a National Bank Chartered under the authority of The United States of America, Treasury Department, Office of the Comptroller of Currency, Charter No. 7064, Defendants.

Civ. A. No. MJG–88–3434.

United States District Court,
D. Maryland.

Aug. 7, 1991.

John A. Scaldara, Wright, Constable & Skeen, Baltimore, MD, Stanley C. Lowicki, Wilmington, DE, for plaintiffs.

Barry J. Dalnekoff, Dalnekoff & Mason, P.A., Annapolis, MD, H. Norman Wilson, Jr., Elkton, MD, for defendants.

## MEMORANDUM AND ORDER

GARBIS, District Judge.

The Court has before it the Defendants' Joint Motion to Disqualify· and the legal memoranda submitted in connection therewith. The Court has held an evidentiary hearing and has heard oral argument on this motion.

## I. THE CAUSE OF ACTION

The underlying cause of action relates to the following matters:

1. In September of 1963, the initial[1] Plaintiff, Alice U. McDaniel ("Alice") had an ownership interest in 110[2] shares ("the subject shares") of the First National Bank of North East ("the Bank").

2. The 110 subject shares consisted of 55 in the name of Alice and her daughter Carolyn Gaumer ("Carolyn"), 45 obtained as a result of a joint tenancy with her late husband Alex H. McDaniel ("Alex") and 10 shares obtained through Alex's Will.

3. In September of 1963 Alice took action with regard to the subject shares. The parties have conflicting contentions as to the action that was taken.

 a. Plaintiffs primarily contend that Alice removed Carolyn's name from 55 shares and added the name of her son Richard McDaniel ("Richard") to all 110 shares as a "revocable possible future beneficiary."

 b. Plaintiffs also have alternative contentions which amount to different

---

**1.** Alice U. McDaniel died in 1989. The present Plaintiffs are her executors.

**2.** The original 110 shares grew, by virtue of stock splits and stock dividends, to 21,565 current shares.

theories on which Carolyn claims an interest in some or all of the 110 shares.

c. Defendants contend that Alice transferred the 110 shares to Richard, subject to the retention by Alice of the right to receive all cash dividends [3] in return for certain stock in publicly sold corporations.

d. Plaintiffs may be contending [4] that, as part of a pattern of allegedly misleading conduct, over a long period of time, Richard made false representations as to the value of Mascotte Corporation and McDaniel Enterprises.

4. Plaintiffs contend that in September of 1987 Alice owned the subject shares and:

a. Agreed with Carolyn that in return for Alice's past and future services, Alice owned the subject shares and Richard had no interest in them.

b. Transferred the subject shares to Alice and Carolyn as joint tenants with right of survivorship.

5. Plaintiffs contend that the Bank, Richard and Defendant John F. Hughes refused, in 1987 and 1988, to give her access to certain bank records.

6. Plaintiffs contend that the Bank engaged in unsound business practices.

7. Plaintiffs additionally contend that all of the Defendants conspired to attempt to (a) prevent the transfer of the subject shares to Carolyn and (b) convert (in 1963 and 1987) the subject shares to the benefit of Richard.

## II. FACTS REGARDING DISQUALIFICATION

The following facts are relevant to the Motion to Disqualify:

1. There was no pertinent connection between Defendants and the law firm of Constable, Alexander and Daneker ("the Constable firm") prior to 1966.

2. The Constable firm was counsel for Richard in regard to his divorce. This representation may have started as early as 1966 and in any event continued into 1969.

a. Richard provided pertinent information to the Constable firm regarding his divorce.

b. The information presented included the fact of his ownership of stock in the Bank (including the subject shares) and, presumably, its estimated value.

c. There is no evidence that there was any communication regarding, or relevant to, the present dispute with respect to the 1963 transfer of the subject shares from Alice to Richard.

3. In 1967, the Constable firm prepared Richard's Will.

a. Richard provided pertinent information to the Constable firm regarding his Will.

b. The information presented included the fact of his ownership of stock in the Bank (including the subject shares) and, presumably, its estimated value.

c. There is no evidence that there was any communication regarding, or relevant to, the present dispute with respect to the 1963 transfer of the subject shares from Alice to Richard.

4. From the early mid–1960's through 1978 (although not continuously throughout the entire period) the Constable firm served as counsel for Mascotte Corporation and McDaniel Enterprises on several matters.

a. The Constable firm's representation of McDaniel Enterprises, Inc. primarily was limited to a specific item of litigation and, possibly, certain real estate transfers and county approvals.

b. From 1974 through 1977, the Constable firm represented Mascotte Corporation in litigation regarding a mortgage foreclosure and, perhaps, in regard to real estate transfers and county approvals.

---

3. Apparently, Defendants are contending that stock dividends would accrue to the benefit of Richard and that cash dividends would be paid to Alice.

4. At the present stage, it is not clear to the Court whether Plaintiffs will be pressing this contention and, if they do, how it is relevant to the case.

5. The Constable firm first represented the Bank in 1953 or 1954 regarding a slip and fall case and then in 1959 in regard to a suit against the Bank on a check.

6. From sometime after 1959 until about 1968 or 1969, the Constable firm was consulted by the Bank on specific matters.

7. In 1968 or 1969, the Constable firm, as general counsel, did all the mortgage and loan legal work of the Bank.

8. In 1969 the Constable firm, primarily by William Pepper Constable (now deceased), represented Richard in regard to a prenuptial agreement pertaining to Richard's second marriage.

a. The file on this matter cannot be located and is believed to have been destroyed long ago.

b. It does not appear that anything in the agreement related to the 1963 transaction although it can be assumed that there was reference to the ownership of stock in the Bank.

9. In 1975–1976 the Bank hired in-house counsel, leaving the Constable firm doing mortgage settlements and foreclosures collection cases and, occasionally, specific matters.

10. In 1976–1978 a Constable firm partner (Frank Howard) was a member of the board of the Bank.

11. Since 1965, John Scaldara ("Scaldara") has been an attorney with the firm of Wright, Robertson and Dowell, later renamed Wright and Parks ("the Wright firm").

12. In January of 1986 the Constable firm merged with the Wright firm to form the firm of Wright, Constable and Skeen. At this time, then, George Constable, Thomas F. Comber, III, James W. Constable, and Frank Howard (former Constable firm members) as well as John Scaldara and the other lawyers in the Wright firm became members of Wright, Constable and Skeen.

13. Frank Howard left Wright, Constable and Skeen in 1987, has not been heard from since and cannot now be located.

14. In October of 1989, by virtue of Alice's death, counsel for Plaintiffs, Stanley Lowicki ("Lowicki") became a potential witness in this case and, therefore, needed to obtain co-counsel who might replace him if necessary.

15. Lowicki chose Scaldara as co-counsel without regard to, and without knowledge of, any connection between the Constable firm and Defendants.

16. In October of 1989 Scaldara undertook the representation of Plaintiffs and, by "Line" filed October 26, 1989 entered his appearance as counsel for Plaintiffs in this case.

17. Scaldara has not received any information regarding the substantive issues in this case from any attorney who was a member of the Constable firm.

18. Scaldara has not had access to any materials of the Constable firm which include, or relate to, matters protected by any attorney/client privilege of the Bank, Richard, Mascotte Corporation or McDaniel Enterprises.

19. Certain files of the Constable firm relating to its representation of the Bank and Richard have been reviewed by Scaldara for purposes of this motion.

a. Scaldara has provided his affidavit stating that there is nothing in those files substantially related to the case at Bar.

b. These files have been available for inspection by the Defendants since early April of 1991.

c. Defendants have not debated the accuracy of Scaldara's affidavit regarding the contents of the files.

20. Scaldara has not been provided with any confidential information which the Defendants may have provided to the Constable firm.

21. Scaldara, however, is now a member of a firm that includes attorneys who were members of the Constable firm when that firm received confidential communications from the Defendants.

## III. THE LEGAL STANDARD

■ A client who entrusts a confidential communication to an attorney must be secure in his expectation that the attorney will not make unauthorized disclosure or use of the confidence. While the outer limits of the client's rights in this regard may sometimes be subject to debate, at the very core is the client's right not to have the confidential communication disclosed to, or used for, a party adverse to the client. Accordingly, there is an absolute rule that an attorney (absent consent in appropriate circumstances) cannot simultaneously represent parties with adverse interests. *See* The Maryland Lawyers' Rules of Professional Conduct, Rule 1.7.

■ When the representation is not simultaneous, the prohibition is not absolute. A lawyer is not necessarily prohibited from representing a client whose interests are adverse to a former client. As stated in *Satellite Fin. Planning v. 1st Nat. Bk. Wilmington,* 652 F.Supp. 1281, 1282–83 (D.Del.1987):

> The appropriate standard in ruling on a motion to disqualify counsel based upon prior representation of a present adversary is the "substantial relationship" test. *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 223 (7th Cir.1978) ... Disqualification is appropriate when the subject matter of the new litigation is substantially related to the subject matter of the past representation.... The underlying purpose for the rule is to ensure that a client's confidential communications to his lawyer are not used against that client when his lawyer later represents a party adverse to the former client....
>
> Despite this strong policy rationale, the rule prohibiting representation of a new client against a former client is not a per se rule. Instead, a court should undertake a "painstaking analysis of the facts" and evaluate applicable precedent before disqualifying counsel. *Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020, 1029 (5th Cir.1981), *cert. denied,* 454 U.S. 895, 102 S.Ct. 394, 70

L.Ed.2d 211 (1981). Only if the moving party proves the requisite substantial relationship should a lawyer be disqualified. A movant for disqualification must have evidence to buttress his claim of conflict because a litigant should, as much as possible, be able to use the counsel of his choice....

The United States Court of Appeals for the Fourth Circuit has recognized that the courts must be careful not to disqualify a party's attorney of choice by the adherence to rigid rules which may not fit the particular case. In *Aetna Cas. and Sur. Co. v. The United States,* 570 F.2d 1197, 1202 (4th Cir.) *cert. denied,* 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), the appellate court reversed the district court's order disqualifying government counsel from representing four individual air controllers in an airplane crash case. Although *Aetna* does not relate to the precise issues presented here, the decision contains the Fourth Circuit's pronouncement that it was "in full accord" with the statement the Connecticut Bar Association had made to the Second Circuit [5] that:

> "[I]t behooves this Court, therefore, while mindful of the existing Code [of ethics], to examine afresh the problems sought to be met by that Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring that client and the judicial system sacrifice more than the value of the presumed benefits."

## IV. DISCUSSION

### a. *The Defendants Are Former Clients*

In the case at bar, the Court is confronted, initially, with the question of the extent to which the firm of Wright, Constable and Skeen is to be treated as former counsel for the Defendants. In short, how does one define the class of former clients of a law firm? In particular, to what extent

---

**5.** *See International Electronics Corp. v. Flanzer,* 527 F.2d 1288 (2d Cir.1975).

does the class include clients of former law firms which have merged with the current firm [6]?

■ The parties have not detailed the nature of the merger of the Constable firm and the Wright firm into Wright, Constable and Skeen. The Court assumes for purposes of the decision that a simple merger occurred, in which the present firm can be considered as the continuation of both of the predecessor firms.[7] The analogy of a river consisting of the combination of two streams is apt. Therefore, downstream from the point of merger, the merged firm is deemed to have as its prior clients all the prior clients of both originally separate firms. Accordingly, the Defendants must be considered to be former clients of Wright, Constable and Skeen.

### b. *The Substantial Relationship Test Is Not Met*

The district court in *Satellite, supra,* suggests that after determining the nature of the prior representation and the present representation, the court should determine whether, "[i]n the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation? ... The burden of proving that there is a substantial relationship falls upon the moving party." 652 F.Supp. at 1283.

■ This Court believes the essential inquiry is whether or not any confidential communications from the Defendants to the Constable firm could be detrimental to the Defendants in the present case. There

are two aspects of this question. First, were there any confidential communications to the Constable firm which are substantially related to the instant lawsuit? Second, even if there were any such communications, is there any likelihood that such communications could be used to the detriment of the Defendants?

The present lawsuit involves a 1963 transaction in which Richard obtained a putative interest in the subject shares in the Bank, false representations as to the value of two privately owned corporations as well as allegations concerning events occurring in 1987 and thereafter which are not pertinent to this discussion.[8]

The prior representations of the Defendants must be analyzed to determine whether it was likely that confidential communications substantially related to the present lawsuit were made to the Constable firm. As stated by Judge Wright in *Satellite, supra,* 652 F.Supp. at 1284:

> "In determining whether a fact [relevant to the present litigation] might have been disclosed [in the prior representation], the Court should consider whether a client and lawyer ought to have discussed the relevant facts or whether it would not have been unusual for the lawyer and client to have discussed the relevant facts.

> \* \* \* \* \* \*

> When resolving this ... question, 'the court should not allow its imagination to run free with a view of hypothesizing conceivable but unlikely situations in which confidential information 'might' have been disclosed which would be relevant to the present suit.' *INA Under-*

---

6. Writing a comprehensive definition of such a class would be an interesting exercise with many difficult questions which need not be addressed in the present case. For example, does the class of a law firm's former clients include all who have been clients of a firm in which any member of the firm has ever been a member or associate? *Cf.* the Second Circuit's "peripheral representation" rule expressed in *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 756–57 (2d Cir.1975).

7. It is conceivable that some other arrangement could have eliminated some Constable firm prior clients from the class. For example, had the old Constable firm continued to operate while only some of its members joined Wright, Constable and Skeen, perhaps some former clients of lawyers who remained behind would not be included in this class.

8. Any pertinent relationship between the Defendants and the Constable firm terminated no later than 1978.

*writers* [*v. Nalibotsky*], 594 F.Supp. [1199] at 1206 [(E.D.Pa.1984)]."

■ The Constable firm's representation of Richard included legal services relating to his divorce, his Will and his antenuptial agreement. Of course, Richard would have made communications regarding the ownership and value of the stock in these corporations. There is nothing in Richard's testimony,[9] or anywhere else in the evidence, however, to indicate that there was any discussion in any way touching upon any issue presented in the instant case.

Moreover, even using the extreme hypothetical (which goes far beyond Richard's testimony) that Richard told the Constable firm how it was that he had obtained the subject shares, it is highly unlikely that Richard would have said anything inconsistent with his having properly obtained the shares as he claims. In the absence of anything to indicate that such a scenario might have occurred, the Court cannot find that the subject matter of this lawsuit is "substantially related" to the subject matter of Constable's prior representation of Richard.

■ The representation of Mascotte Corporation and McDaniel Enterprises was limited to specific litigation which had no ascertainable relationship to any alleged misrepresentation of the value of the stock in those corporations. It is possible to hypothesize a communication relating to the representation which may have indirectly related to the value of the corporate shares. Here again, however, the Court finds it extremely unlikely that any pertinent confidential communication took place.

■ The representation of the Bank was limited to specific matters and general loan and mortgage work unrelated to the present lawsuit. Further, while a Constable firm attorney was a member of the board of the Bank during 1976–78, there is no evidence of any confidential communication

to that attorney bearing upon the present lawsuit.

The Court finds the relationship between the prior representations of Defendants and the current lawsuit to be no more substantial than the relationship presented in the *Satellite* case, *supra*. There, a law firm's prior representation of a client with regard to its incorporation did not require disqualification of the firm in a later suit against the client corporation. *See also, Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 39 (D.D.C. 1984) (prior representation consisting of general anti-trust advice insufficient to disqualify counsel in particular anti-trust action); *CITC Industries, Inc. v. Manow International Corp.*, 1978–1 Trade Cases (CCH) par. 61,947, 1978 WL 1317 (prior patent application not substantially related to claimed invalidity of another patent); *Emm Ess Metals Co., Inc. v. Triumph Alloys International, Inc.*, 1979–1 Trade Cases (CCH) par. 62,680, 1979 WL 1636 ("This Court knows of no authority for a per se rule that a firm which has served as general counsel to a client is barred from representing clients in an adversary proceeding against the former client."). In sum, this Court concludes that Defendants have established no likelihood that there was any confidential communication which bears any substantial relationship to the present lawsuit and/or which, even if it were disclosed to Scaldara, would cause any detriment to Defendants.

c. *Even If The Former Firm Were "Tainted", Disqualification Of Scaldara Would Be Inappropriate*

While the above reasoning is sufficient to decide this case, the Court must note that even if, somehow, in some theoretical manner, the Court could find that some related confidential communications from the Defendants to the Constable firm took place,

---

**9.** Richard was not required to state specifically the contents of any confidential communications. Richard could not, however, recall the specifics of any pertinent communications to the Constable firm, quite understandable due to the passage of time. Therefore, he could not

testify, even in the most conclusory of terms, that he communicated anything to the Constable firm bearing on the issues presented herein other than, presumably, the fact that he owned the subject shares and their estimated value.

disqualification of Scaldara would not be appropriate in the context of this case.

 As noted above, it is fair to view the merger of the Constable and Wright firms into Wright, Constable and Skeen as the joining of two streams into a merged river when the January, 1986 merger occurred. The Court notes, however, that Scaldara, coming from the Wright stream, could not, even theoretically, have had access to Defendant's confidential communications to the Constable firm until January of 1986. Moreover, this theoretical access was, and is, possible only through conversations with the former Constable firm members who joined Wright, Constable and Skeen, or through access to documents reflecting the confidential communications.

As to possible conversations, this Court credits the testimony of Scaldara, which Defendants do not dispute, that in fact he has had no conversations with any former Constable firm attorney about the substance of this case. Since no such past conversations have taken place, it is necessary to determine whether a future conversation could occur in which Scaldara could have improper access to pertinent communications. Even putting aside the high degree of unlikelihood that Scaldara would try to discuss these matters with a former Constable firm lawyer, the evidence establishes that he could not succeed. Every former Constable firm lawyer who has received any pertinent confidential communication from the Defendants was either deceased at the time of the merger with the current firm (*i.e.* Mr. William Pepper Constable), departed Wright, Constable and Skeen prior to any contact from Plaintiffs about this case and cannot be located (*i.e.* Mr. Frank Howard), or has no recollection of any such communications (Mr. Comber and Mr. Richard Constable).

As to possible document access, the evidence establishes that no file has been located which could, even arguably, be said to contain a pertinent confidential communication. The firm of Wright, Constable and Skeen has offered access to Defendants to all files that it has been able to locate relating to the Constable firm's legal services for any of the Defendants. Scaldara's affidavit states that the files contain nothing pertinent and Defendants, after having access to the subject files, do not dispute this. Therefore, since there is no known document from which Scaldara could learn about any confidential communications from Defendants, there remains only the possibility that a document might be located in the future.

The Court notes that more than five years have passed since the 1986 merger and there is every indication that all files relating to the representation of the Defendants from 1963 to 1978 had even then been destroyed. In light of these facts, this Court finds only a very remote possibility that any such file will be located, much less one containing a document reflecting any confidential communications from Defendants to the Constable firm. Therefore, while theoretically existent, the chance that any "tainted" document will be located is so remote, and the probability that protective measures will be effective to prevent disclosure so great, that the Court concludes with a high degree of certainty that no disclosure of a confidence to the detriment of the Defendants will take place. Moreover, the very small chance of a future disclosure can be reduced even further by a suitable Protective Order to insure that, under no circumstances, will any counsel for Plaintiffs have access to any pertinent documents which may, in the future, be discovered.

## V. CONCLUSION

For the foregoing reasons, Defendants' Joint Motion to Disqualify is DENIED.