707 A.2d 806

**Alan F. POST, Chartered**

v.

**Douglas M. BREGMAN et al.**

No. 15, Sept. Term, 1997.

Court of Appeals of Maryland.

Jan. 15, 1998.

Reconsideration Denied March 6, 1998.

144

Roger T. Scully (Andrew Robertson, on brief), Bethesda, for Petitioner.

Glen M. Cooper (Patricia M. Weaver, Paley, Rothman, Goldstein, Rosenberg & Cooper, Chartered, on brief), Bethesda, for Respondent.

William J. Murphy, Robert T. Shaffer, III, Murphy & Shaffer, Baltimore, brief amicus curiae of Goldman, Skeen & Wadler, P.A.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

WILNER, Judge.

This is a dispute between two lawyers over the division of one-third of a fee. A letter agreement called for petitioner, Alan F. Post, Chartered (Post), to receive 60% of the third and for Douglas Bregman and his firm (Bregman) to receive the other 40%. The remaining two-thirds of the fee was paid to another firm that is not involved in the instant dispute. When the underlying case that generated the fee was settled, Post received the entire one-third share, $260,000, and he then balked at paying Bregman the 40% called for in the letter agreement ($104,000), contending that Bregman had done insufficient work to warrant a fee in that amount. Instead, Post filed an action for declaratory judgment in the Circuit Court for Montgomery County, asserting that his honoring of the 60/40 fee arrangement would violate Rule 1.5(e) of the Maryland Lawyers' Rules of Professional Conduct (MLRPC). Bregman filed a two-count counterclaim for declaratory judgment and for breach of contract.

The circuit court concluded, on summary judgment, that the fee agreement was clear and unambiguous, that Post breached the agreement and was liable for damages, and that the alleged violation of MLRPC Rule 1.5(e) did not suffice to constitute a defense to the breach of contract action. It granted Bregman's motion for summary judgment, entered judgment on the breach of contract counterclaim in favor of Bregman for $112,881, and dismissed the opposing actions for declaratory judgment as moot. The Court of Special Appeals affirmed, *Post v. Bregman*, 112 Md.App. 738, 686 A.2d 665 (1996), and we granted *certiorari* to consider (1) whether a fee-sharing agreement between lawyers is subject to MLRPC

Rule 1.5(e) and may be rendered unenforceable if in violation of that rule, and (2) whether there was a sufficient dispute of material fact regarding Bregman's performance to preclude summary judgment. Our affirmative answer to the first question will obviate the need to answer the second. We shall reverse the judgment of the Court of Special Appeals and direct that the case be remanded to the circuit court for further proceedings.

## FACTUAL BACKGROUND

MLRPC Rule 1.5 deals generally with lawyers' fees. Section (a) requires that the fees be reasonable and sets forth some factors to be considered in determining reasonableness. Section (b) requires that the basis or rate of the fee be communicated to the client, if the lawyer has not regularly represented the client. Section (c) allows contingent fees, subject to certain conditions set forth in that section and certain prohibitions specified in § (d); and § (e)—the section at issue here—deals with the splitting of fees among lawyers who are not part of the same firm. It states:

"A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable."

In 1988, Stanley Taylor was diagnosed as suffering from chronic myleogenous leukemia. Believing that his condition may have been caused by exposure to a toxic substance during his employment, he sought legal assistance for the purpose of obtaining workers' compensation benefits. He found a lawyer, who filed a claim, but when benefits were initially denied the lawyer withdrew. Taylor then, in August, 1989, interviewed Mr. Bregman as a prospective replacement. Bregman in-

formed Taylor that his firm did not handle workers' compensation claims but introduced him to Post who, Bregman explained, had considerable experience in that field. Bregman, it appears, had referred other cases or clients to Post in accordance with a mutually acceptable fee-sharing arrangement. Taylor later retained Post to pursue the compensation claim, which Post did successfully.

While the compensation case was pending, Taylor retained Post to file a separate action against the suppliers of the toxic substance. The retainer agreement with respect to the third-party action called for Post to receive a fee of one-third of any recovery if the case was settled and 40% if suit was filed and discovery undertaken. The agreement also provided that "[a]ssociate counsel may be employed at the discretion and expense of Alan F. Post, Chartered without any increase in the attorneys' fees to be paid by client."

Post did not believe himself capable of handling the litigation alone, so, in June, 1990, he brought in the firm of Connerton, Ray & Simon, and entered into a three-way arrangement with that firm and Bregman's firm.[1] On June 14, 1990, he confirmed the arrangement in letters to Bregman and to Ron Simon, of the Connerton firm. In his letter to Bregman, Post acknowledged that Bregman had referred Mr. Taylor with respect to both the worker's compensation claim and the third-party action and that "we have brought in as co-counsel" the Connerton firm. He noted that he and Bregman had discussed the active participation of Bregman's firm in the case and that he (Post) and Simon believed that "there will certainly be opportunities for the use of manpower from your office to handle various pleadings, depositions, etc." He continued:

---

1. Post later claimed that he was forced to bring the Connerton firm into the case because of Bregman's failure to honor a commitment he made to contribute $2,000/month toward the cost of an associate, who was to devote 50% of her time to the case. Bregman made only one payment, of $2,000, in February, 1990. Bregman disputed that claim.

"Therefore, we have agreed that the firm of Bregman, Berbert & Schwartz will share in the recoveries to the extent of 25% of all fees recovered from the third party litigation.

You will be called upon to contribute 25% of all out-of-pocket expenses and an appropriate allocation of the labors of litigation."

That arrangement was recited in Post's letter to Simon as well. There, he confirmed that they had agreed, with respect to Taylor's case, that "the referring law firm of Bregman, Berbert & Schwartz will be entitled to 25% of the net fee recovery, provided that they meet their commitment of contributing 25% of costs as well as such litigation related tasks as shall be assigned to them." The letter continued that Post and Connerton would share the other 75% equally. It was anticipated that Taylor's case would be consolidated with at least two others, in which Bregman had no interest, and that the fees generated in those cases would be shared equally between Post and the Connerton firm. Bregman claimed that he responded to Post's letter on June 21, noting in his response that the letter correctly stated the understanding, subject to two clarifications. The one of interest here is Bregman's statement that "our firm's involvement in the third party actions is dependent upon direction from you or Ron Simon. We are excited about working the case with you, but we cannot do work until you delegate. If you do not ask us to do 25% of the work, nevertheless, our fee will still be 25%." A copy of Bregman's letter, properly addressed to Post, is in the record; Post claimed that he did not recall having seen that letter, although he never denied having received it.

In September, 1990, suit was filed in Taylor's case in the Superior Court of the District of Columbia, with the Connerton firm acting as lead counsel. Connerton continued in that role until October, 1991, when it withdrew from the case. Faced with that withdrawal, Post then contacted the firm of Paulson, Nace, Norwind & Sellinger, which, as a condition of assuming the role of lead counsel, insisted on receiving two-thirds, rather than one-half, of the total contingency fee. In a

letter to Barry Nace of that firm, dated December 20, 1991, Post agreed to that arrangement—one in which the Paulson firm would act as lead counsel "and bear responsibility for the costs entailed in the litigation." [2] That required a new arrangement with Bregman. The next day, December 21, 1991, Post wrote to Bregman, informing him that he (Post) had decided to engage the Paulson firm, which had agreed to fund the litigation, including expected discovery costs in excess of $100,000. The letter concluded:

> "Unfortunately, the one draw back is that there has been an upset in the fee arrangements, and we are no longer in a position to extend a referral fee of 1/3 of the gross amount of fees. Barry [Mr. Nace, of the Paulson firm] is insisting on a 2/3 share for [h]is firm, which in a sense is reasonable considering the fact that he is taking on the expenses as well. That leaves 1/3 as a remaining fees [sic] to be divided up and I would propose that I will split that remaining portion with you on a 60/40 basis in an effort to be reasonably fair."

With one modification, Bregman accepted the new arrangement. At the bottom of the letter, the words "Plus Costs" and "Plus unpaid fees owed" were added in handwriting and initialed by Post.

On November 1, 1994, the Taylor case was settled, as a result of which Post received $260,000, representing one-third of the fee. The Paulson firm received the other two-thirds. It is not clear from the record before us what initial communications occurred between Post and Bregman regarding Bregman's share of the fee. Bregman asserted that, upon his inquiry, Post informed him that his (Bregman's) share of the fee was between $80,000 and $90,000. It appears that, on November 10, 1994, Post wrote to Bregman offering to settle

---

**2.** By letter of January 3, 1992, Mr. Nace accepted those terms, with two clarifications: (1) Paulson's minimum fee would be 26.67% if the case was settled or resolved by jury verdict and 33.33% if an appeal was necessary, and (2) Paulson would not be responsible for any costs incurred up to that point, but only costs incurred by Paulson thereafter.

the matter for $50,000, an offer that Bregman rejected the next day.[3] With an impasse looming, Post, on November 28, filed a Complaint for Declaratory Relief in the Circuit Court for Montgomery County. Though acknowledging the December 21, 1991 letter, Post contended that, whereas, between December, 1991 and October, 1994, he (1) was directly involved in the preparation or review of over 100,000 pages of documentation, (2) participated directly in 35 depositions, reviewed 62 others, and attended 30 court hearings and over 100 litigation conferences, and (3) expended "thousands of hours" and "thousands of dollars" in the representation of Mr. Taylor, Bregman drafted no documentation, participated in no depositions, attended no court hearings or conferences, and expended no material amount of time or money on the case. He therefore asked the court "to declare the letter agreement dated December 20, 1991, unenforceable as against public policy, and to declare [Bregman's] demand to recover a fee in an amount in excess of $100,000, without performing any material services and/or assuming any significant responsibility for the benefit of either [Taylor or Post] to be a 'per se' violation of Rule 1.5(e) of the Maryland Rules of Professional Conduct."[4]

In response to a motion to dismiss, Post filed an Amended Complaint and then, in response to another motion to dismiss, a Second Amended Complaint seeking essentially the same relief. Specifically, he asked the court to declare that (1) MLRPC and, in particular, Rule 1.5(e) governs the conduct of

---

**3.** The November 10 letter from Post is not in the record. Bregman's response, dated November 11, is in the record. In that response, Bregman takes issue with a number of allegations and claims made in Post's letter, most particularly the claim that Bregman contributed very little to the litigation and that the fee agreement might violate Rule 1.5(e) of the MLRPC.

**4.** Throughout the record, the parties sometime refer to the letter of December 20 and sometime to the letter of December 21. As noted, the first letter was sent by Post to Nace; the second letter was sent by Post to Bregman. Bregman accepted the arrangement communicated to him in the letter of December 21, so that letter constituted the effective agreement between Post and Bregman.

the parties, (2) there was no written agreement with Taylor for joint representation, (3) Taylor was advised and consented to joint representation of all co-counsel except for Bregman, (4) in order to obtain the division of fees claimed by Bregman, he would have been required to perform services in proportion thereto, (5) Bregman either did or did not do so, and (6) the existence of "an alleged fee sharing agreement" does not create an exception to the requirements of Rule 1.5(e).

Bregman promptly responded with a counterclaim for declaratory judgment and for breach of. contract. Reciting the two letter agreements of June 21, 1990, and December 21, 1991, Bregman asserted, among other things, that his firm had engaged in a "wide array of legal services" in connection with the tort litigation, that it was co-counsel of record throughout the litigation, that it was "jointly responsible" for Taylor's representation, and that Post "never requested any participation or provision of services by the Bregman firm that the Bregman firm did not fully satisfy." Bregman denied any violation of Rule 1.5(e) on his part; he asserted that, if there was a violation of the .Rule, it was Post who was responsible and that Post's wrongful conduct should not affect Bregman's entitlement to agreed-upon fees. He asked that the court declare that he was entitled to $104,000 in legal fees and that MLRPC is "not an impediment to the enforceability of [the contract between the parties]." In the breach of contract count, Bregman sought judgment for $106,000 plus costs advanced in the Taylor litigation, interest, and court costs.

On this state of the pleadings, Bregman renewed a motion for summary judgment that he had filed earlier. In connection with that motion, through documents and stipulations, the following "facts" were presented:

(1) From the beginning and throughout the Taylor litigation, Bregman was listed on the pleadings as co-counsel;

(2) The Bregman firm participated in the drafting of the initial complaint, a copy of which was sent to him as co-counsel;

(3) The Bregman firm participated in drafting an amended complaint in March, 1991;

(4) Bregman and his firm were included on the Official Service List provided to the clerk of the court in February, 1992;

(5) No separate retainer agreements were entered into between Taylor and the Connerton firm, between Taylor and the Paulson firm, or between Taylor and Bregman;

(6) Post kept no accounting of the time he or his firm spent on the Taylor litigation and, obviously, gave no such accounting to the Paulson firm;

(7) The Paulson firm gave no accounting to Post of the time it spent on the Taylor litigation; and

(8) "At no time during the course of the Taylor litigation was the Bregman firm assigned any task that it did not properly perform."

 Other documents, in the form of statements under oath but made on information and belief rather than on personal knowledge, purported to generate some dispute over Bregman's role in the litigation. Taylor, for example, claimed that he had never requested Bregman or his firm to represent him "in any legal matter," that he never consented to their representation, and that, until December, 1994, he was unaware that Bregman or his firm provided any service on his behalf. Notwithstanding other evidence that Taylor received a copy of every paper filed in his case, all of which showed Bregman as co-counsel, Taylor also stated that he was unaware that Bregman was listed as co-counsel. Post asserted that, "[a]t no time during the period April, 1991 through November 1, 1994, did Mr. Bregman perform, any further services in the Taylor matter" and that "[i]n order to meet the demands of the case, I was forced by Mr. Bregman's failure to perform to reduce my other caseload, causing a substantial financial sacrifice." That, of course, stands in sharp contrast to Post's stipulation, quoted above, that at no time during the litigation was the Bregman firm assigned any task that it did not properly

perform. It also stands in contrast to Bregman's statement that his firm performed "a wide array" of legal services to Taylor, including meeting with and interviewing the client, developing legal theories, investigating potential defendants, drafting pleadings, appearing in court, attending a deposition, meeting with co-counsel to discuss strategy, conducting legal research, and reviewing pleadings. He added that on several occasions he called Post to inquire what else he could do to be of assistance and was often told that nothing was then required.[5]

The issues presented to the court through Bregman's motion were clear. Post asserted that the fee arrangement

---

5. Maryland Rule 2–501(c) requires an affidavit in support of or in opposition to a motion for summary judgment to be on personal knowledge. A statement based only on information and belief does not suffice as an affidavit, even if under oath. *Fletcher v. Flournoy*, 198 Md. 53, 81 A.2d 232 (1951), *cert. denied*, 343 U.S. 917, 72 S.Ct. 649, 96 L.Ed. 1331 (1952); *White v. Friel*, 210 Md. 274, 123 A.2d 303 (1956). Rule 2–501(a) requires a motion for summary judgment to be supported by an affidavit or other statement under oath only if the motion is filed before the day on which the adverse party's initial pleading or motion is filed, and Rule 2–501(b) requires that a response be supported by affidavit or other statement under oath only when the motion is supported by affidavit or other statement under oath and the respondent desires to controvert a fact contained in the affidavit or statement under oath filed in support of the motion.

As Judge Niemeyer and Ms. Schuett point out, this follows the broader mandate of Rule 2–311(d), requiring *any* motion or response that is based on facts not contained in the record or in papers filed in the proceeding to be supported by affidavit. PAUL V. NIEMEYER AND LINDA M. SCHUETT, MARYLAND RULES COMMENTARY 331 (2d ed. 1992). The particular language in Rule 2–501 simply recognizes the fact that, if a motion for summary judgment is filed before the adverse party's initial pleading is filed, there is no record, and thus nothing to supplant the need for an affidavit or other statement under oath.

The effective motion for summary judgment in this case was filed (or renewed) after both sides had filed various pleadings and motions, so a record of sorts did exist. Nonetheless, at least to the extent that the assertions contained in the purported affidavits were not otherwise in the record or in other papers previously filed and sought to establish facts that were not accepted by the opposing party, an affidavit in proper form was required by Rule 2–311(d). Except for one supplementary affidavit, each of the "affidavits" filed by or on behalf of either party, were stated to be on information and belief; none of them, therefore, were legally sufficient as affidavits.

provided for in the December, 1991 letters was subject to the requirements of MLRPC Rule 1.5(e), requiring either that the division be in proportion to the services performed or that, by written agreement with the client, the lawyers assume joint responsibility for the representation, and that neither condition was met. Accordingly, the arrangement was unenforceable and all that Bregman was entitled to was what would be due on a *quantum meruit* basis. Bregman, on the other hand, contended (1) that Rule 1.5(e) was an ethical rule, enforceable through the attorney grievance mechanism, but that it did not serve to affect or modify the December, 1991 agreement, and (2) even if the arrangement was subject to the rule, the rule was not violated, as there was, in fact, a joint responsibility for the representation. The latter contention was based largely on the facts that Bregman was listed as co-counsel on all pleadings and other papers, he actually performed work on the case, and Post was authorized in his retainer agreement with Taylor to engage other counsel.

The court viewed the case, essentially, as a breach of contract action, to which the ethical argument made in Post's complaint for declaratory judgment was offered as a defense. It found that there was a contract between the parties— emanating from the December, 1991 letter—and that the contract was clear and unambiguous. It also determined that the "ethical question is not a defense to a breach of contract between the parties," especially when one of the parties, Post, "not only entered into, but in his case made the proposal himself." Upon those findings, the court granted Bregman's motion for summary judgment with respect to the breach of contract claim and declared, as a result, that there no longer was a dispute requiring a declaratory judgment. It manifested those decisions in an order entered on June 19, 1995, granting summary judgment on Count II of Bregman's counterclaim, entering judgment in favor of Bregman in the amount of $112,881 (representing the $104,000 share of the fee, reimbursement for $2,233 in funds contributed by Bregman, and pre-judgment interest on the $106,233 from Novem-

ber 1, 1994), and dismissing Post's complaint and Count I of Bregman's counterclaim as moot.

In his appeal to the Court of Special Appeals, Post claimed that the circuit court erred (1) in finding, on summary judgment, that the fee agreement consisted only of the December letter, rather than the combination of the June and December letters, and in further finding that the agreement was clear and unambiguous, and (2) in concluding that the agreement was not governed by MLRPC Rule 1.5. On the first issue, the appellate court concluded that there was, in fact, a dispute over whether the June letter was part of the agreement between the parties, but it determined that the dispute was not a material one and that, even if the two letters are read together, the resulting agreement was clear and unambiguous. The alleged "duty" on the part of Bregman to contribute 25% to the litigation, mentioned in the June letter, was, in the court's view, a passive one: "The plain language of the contract, then, specifies that appellees' role in the litigation was a passive one; no duty to contribute would arise until appellees were 'called upon.' " *Post v. Bregman, supra,* 112 Md.App. at 754, 686 A.2d at 672.

The second issue, it said, emanated from the principle established in *Von Hoffman v. Quincy,* 71 U.S. (4 Wall.) 535, 550, 18 L.Ed. 403 (1866), that parties to a contract are deemed to have contracted with knowledge of existing law and that "the laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Post v. Bregman, supra,* 112 Md.App. at 758, 686 A.2d at 674, quoting from *Wilmington Trust Co. v. Clark,* 289 Md. 313, 320, 424 A.2d 744, 749 (1981), quoting in turn from *Von Hoffman v. Quincy, supra.* Although recognizing that statutes constitute "law for purposes of interpreting contracts," the court drew from *Attorney Gen. of Maryland v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), "a clear distinction between legislative enactments and the legislature in general and rules passed by the judiciary for the purpose of regulating the conduct of lawyers" and concluded from that that MLRPC did not constitute

"laws" to be read into contracts. Nor, the court continued, did MLRPC qualify as "judicial precedent," even assuming that judicial precedent was automatically incorporated into contracts. Finally, the court turned to the concern expressed in the Scope part of MLRPC that the purpose of the rules "can be subverted when they are invoked by opposing parties as procedural weapons" and the admonition that the fact that the rules may be a basis for disciplining lawyers "does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule." To a large extent, this view followed earlier pronouncements by the Court of Special Appeals that MLRPC does not represent a reflection of public policy. *See Kersten v. Van Grack,* 92 Md.App. 466, 608 A.2d 1270 (1992); *compare,* however, *Fraidin v. Weitzman,* 93 Md.App. 168, 191, 611 A.2d 1046, 1057 (1992).

From all of this, the Court of Special Appeals concluded that "the judiciary must be extremely careful not to abuse its autonomy by extending the application of the rules it promulgates into areas not within its primary authority" and that "the enforceability in contract of fee-sharing agreements between attorneys is one such area." *Post, supra,* at 762, 686 A.2d at 676.

## DISCUSSION

### A. An Unresolved Issue

Although the major issue presented to the circuit court was whether the fee agreement between Post and Bregman was subject to MLRPC Rule 1.5(e) (and what the effect of that subjection might be), Bregman made clear his position that, even if the rule were applicable, it was not violated, at least not by him. The principal basis for that position was that there was, in fact, a joint responsibility on the part of Post and Bregman for the representation of Taylor, and that, in turn, was based on (1) the retainer agreement between Post and Taylor allowing Post to engage additional counsel, (2) the fact that Bregman was listed on pleadings, papers, and the official service list as co-counsel, and (3) the fact that he and his firm

actually performed considerable work on the case. Apart from that, Bregman contended that his further participation was dependent on being asked to perform work by Post, that he offered to perform additional work but was not called upon to do any, and that he did properly perform whatever tasks were assigned to him.

Because of its finding that any alleged violation of Rule 1.5(e) would not suffice as a defense to enforcement of the fee agreement, the court never reached the question of whether there was, in fact, a violation of the Rule. Indeed, given the nature of the record, it is not at all clear that the violation issue could properly have been resolved on summary judgment. Other than the stipulations and the documents themselves, the only "evidence" before the court bearing on that issue was either in dispute, or in the form of legally insufficient "affidavits," or both. At the very least, the court would certainly have had discretion to deny summary judgment on that ground and allow further development of the relevant facts. *See Metropolitan Mtg. Fd. v. Basiliko,* 288 Md. 25, 28, 415 A.2d 582, 583 (1980): "whereas a 'court cannot draw upon any discretionary power to grant summary judgment' (6 Pt. 2 MOORE'S FEDERAL PRACTICE ¶ 56.15[6], at 56–601 (2d. ed.1980)), it, ordinarily, does possess discretion to refuse to pass upon, as well as discretion affirmatively to deny, a summary judgment request in favor of a full hearing on the merits; and this discretion exists even though the technical requirements for the entry of such a judgment have been met."

■ Bregman continued to press his argument, in both the Court of Special Appeals and before us, that there was no violation of the Rule, but that is an issue we cannot address. As we pointed out in *Geisz v. Greater Baltimore Medical,* 313 Md. 301, 314 n. 5, 545 A.2d 658, 664 n. 5 (1988), "[o]n an appeal from the grant of a summary judgment which is reversible because of error in the grounds relied upon by the trial court the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial

court had a discretion to deny summary judgment." *See also Three Garden Village Ltd. Partnership v. U.S. Fidelity & Guar. Co.,* 318 Md. 98, 567 A.2d 85 (1989); *Gross v. Sussex,* 332 Md. 247, 630 A.2d 1156 (1993). We therefore must look only to the ground relied upon by the circuit court—whether MLRPC Rule 1.5(e) is relevant in determining the enforceability of the fee agreement.

## B. The Actions For Declaratory Judgment

 As noted, the circuit court dismissed Post's and Bregman's respective actions for declaratory judgment on the ground that, by entering judgment on Bregman's breach of contract claim, the actions for declaratory judgment were moot. If the issue raised in an action for declaratory judgment is truly moot, the action may properly be dismissed, for, as we held in *Reyes v. Prince George's County,* 281 Md. 279, 289 n. 5, 380 A.2d 12, 18 n. 5 (1977), the declaratory judgment process "is not available for the decision of purely theoretical questions which may never arise, questions which have become moot and abstract questions" and should not be used "where a declaration would neither serve a useful purpose nor terminate a controversy." Nonetheless, when an action for declaratory judgment does clearly lie, as it did in this case, it is ordinarily not permissible for a court to avoid declaring the rights of the parties by entering judgment on another pending count. *Compare Popham v. State Farm,* 333 Md. 136, 140 n. 2, 634 A.2d 28, 29 n. 2 (1993), where, though noting that the resolution of another claim in the same action rendered moot the need for a declaratory judgment, we also observed that the order purporting to dismiss the declaratory judgment action "also declared the rights of the parties."

 We understand the constraints under which trial judges must operate and can well appreciate the court's desire to avoid the extra effort necessary to draft a declaratory judgment when, in its view, the entry of judgment on the breach of contract action essentially decides the issue. Nonetheless, we have historically enforced the provisions of the Declaratory Judgment Act and insisted that courts declare the

rights of the parties when presented with an action properly susceptible to a declaratory judgment. Rarely, we have held, is it permissible to dismiss an action for declaratory judgment in lieu of declaring the rights of the party seeking the judgment. *See Broadwater v. State,* 303 Md. 461, 494 A.2d 934 (1985). We have made clear that, as a general rule, courts will not entertain a declaratory judgment action "if there is pending, at the time of the commencement of the action for declaratory relief, another action or proceeding involving the same parties and in which the identical issues that are involved in the declaratory action may be adjudicated." *Waicker v. Colbert,* 347 Md. 108, 113, 699 A.2d 426, 428 (1997). We have not, however, except in the peculiar circumstance of *Popham v. State Farm, supra,* 333 Md. 136, 634 A.2d 28, generally blessed the dismissal of a proper action for declaratory judgment because of a ruling on an alternative claim in the same action. The existence of another remedy, at law or in equity, does not ordinarily defeat a party's right to seek and obtain a declaratory judgment. *Turner v. Mfrs. Casualty Ins. Co.,* 206 Md. 601, 112 A.2d 670 (1955); *Glorius v. Watkins,* 203 Md. 546, 102 A.2d 274 (1954).

This case, in particular, was appropriate for declaratory judgment. Post, indeed, objected to the court's refusal to declare his rights. After the court announced its intended decision, he argued his right to a declaration and asked that the court, in writing, define the contract (which was in dispute), state whether MLRPC Rule 1.5(e) applied to the contract, and declare whether he was or was not entitled to the relief he sought. This was not an ordinary breach of contract action. As is the case with many lawyers, both parties used fee-sharing agreements in their practices, and they sought a specific determination of whether MLRPC Rule 1.5(e) applied to their fee-sharing agreement, and, if so (1) whether the Rule was violated in this case, and (2) if the Rule was violated, what the effect of that violation was on the contract. They were entitled to a specific written declaration, not just oral rulings or implicit determinations, on those matters. It is the *judgment* that must declare the rights of the parties. *Robert T.*

*Foley Co. v. W.S.S.C.,* 283 Md. 140, 389 A.2d 350 (1978). As we shall be directing a remand of the case because of our disagreement with the substantive ruling of the court on the application of Rule 1.5(e) in any event, the court will have an opportunity to correct this deficiency and declare the rights of the parties.

### C. The Effect of MLRPC Rule 1.5(e)

■ The dispute over the status and effect of Rule 1.5(e) has been viewed in two somewhat different ways so far in this proceeding. The circuit court regarded Post's argument as being in the nature of a defense to an action for breach of contract—as an assertion, in other words, that the Rule constituted a statement of supervening public policy and that the fee agreement was unenforceable because it was in violation of that public policy. That certainly was the position set forth in Post's initial complaint for declaratory judgment. It is established in Maryland that a contractual provision that is in violation of public policy, to the extent of the conflict, is invalid and unenforceable. *State Farm Mut. v. Nationwide Mut.,* 307 Md. 631, 516 A.2d 586 (1986); *Walsh v. Hibberd,* 122 Md. 168, 89 A. 396 (1913). The Court of Special Appeals, citing *Wright v. Commercial & Sav. Bank,* 297 Md. 148, 464 A.2d 1080 (1983), viewed Post's argument more as one of incorporating the Rule into the agreement, as defining or shaping the terms of the agreement rather than as acting as a defense to it. In that context, a violation of the Rule would not serve to invalidate the contract or render it unenforceable but rather would constitute a violation of the contract itself.

Post's argument has, indeed, fluctuated between the two but is currently cast closer to the Court of Special Appeals view of it. He does not now contend that the fee-sharing agreement, calling for a 60/40 split of one-third of the fee, itself is in violation of the Rule; what is unethical and therefore impermissible, in his view, is Bregman's demand for a 40% share when he did not make a proportionate contribution to the effort. Presumably, he would find no problem with the agreement, or its enforcement, if Bregman, in fact, had contributed

40% of one-third (or 13%) of the effort or if there was, in fact, a joint responsibility for the representation. Because he believes that neither circumstance existed, he urges that the agreement, read in light of Rule 1.5(e), cannot be enforced precisely as written.

The disagreement over whether Rule 1.5(e) is either subsumed into the contract between the parties or constitutes an external check on its enforcement stems from a larger disagreement over whether the Rule, or MLRPC in general, constitutes a cognizable and enforceable statement of public policy, equivalent in effect to a statute. On that more general question, one finds seemingly contradictory pronouncements from courts around the country, each party citing to us the pronouncements that purport to favor his position. One must be careful, however, to consider the underlying basis of those pronouncements. A number of courts, for example, have viewed the Code of Professional Conduct and the various disciplinary rules and ethical considerations that pertain to it as merely "self-imposed internal regulations prescribing the standards of conduct for members of the bar," *State v. Ford,* 793 P.2d 397, 400 (Utah.Ct.App.1990), quoting in part from *People v. Green,* 405 Mich. 273, 274 N.W.2d 448, 454 (1979), and, for that reason, not as "a vehicle for defining public policy." *Tanasse v. Snow,* 929 P.2d 351, 355 (Utah.Ct.App. 1996); *see also In re Dineen,* 380 A.2d 603, 604 (Me.1977); and *Niesig v. Team I,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 495, 558 N.E.2d 1030, 1032 (1990). In the Maine case, *Dineen,* the court made clear that the Code did not "have the force of positive law" because it was promulgated only by the State Bar Association and not by the court. It is not clear from the opinions who promulgated the Code in Michigan and Utah; in New York, it was apparently promulgated by the State Bar Association and "enacted" by the intermediate appellate division of the New York courts. *Niesig, supra,* 559 N.Y.S.2d at 495, 558 N.E.2d at 1032.

■ In Maryland, the rules contained in MLRPC do not constitute "self-imposed internal regulations." They are not

precatory guidelines adopted by lawyers or by lower levels of the court system, but are rules adopted by this Court (Md. Rule 16–812) in the exercise of its inherent Constitutional authority to regulate the practice of law. *Attorney General v. Waldron, supra,* 289 Md. 683, 426 A.2d 929. Together with the rules governing admission to the Bar, rules pertaining to attorney trust and bank accounts, rules governing the disciplining of lawyers, and other rules governing specific conduct by lawyers (*see,* for example, Rule 16–401), they serve to regulate virtually every aspect of the practice of law, establishing both general and particular standards for how lawyers must handle funds belonging to them or to others and how they may and may not deal with each other, with the courts, with their clients, with adverse parties, with witnesses, and with the community at large.

■ Unquestionably, so thorough a regulation of an occupation and professional calling, the integrity of which is vital to nearly every other institution and endeavor of our society, constitutes an expression of public policy having the force of law. We made the point with unmistakable clarity in *Waldron*—that "the power generally to regulate matters regarding the profession and its practitioners, are reposed inherently in the judiciary" (*id.* at 694, 426 A.2d 929), that "the obligation of the judicial branch of government to monitor and manage its own house are not hollow proclamations of power, for the placement of this responsibility with the judiciary represents a recognition of the special, and to a degree, unique relationship that has evolved over the years between the legal profession and the tribunals of justice it serves" (*id.* at 695, 426 A.2d 929), and that, although the Legislature may act "to aid the courts in the performance of their judicial functions," the judicial branch nonetheless retains the "fundamental authority and responsibility" to "carry out its constitutionally required function, an aspect of which . . . is the supervision of practicing lawyers." *Id.* at 699, 426 A.2d 929. *See also In re Application of Allan S.,* 282 Md. 683, 689 387 A.2d 271, 275 (1978): "Upon this Court falls the primary and ultimate responsibility

for regulating the practice of law and the conduct and admission of attorneys in this State."

MLRPC represents the exercise of that authority, the discharge of that responsibility. To the extent, therefore, that the pronouncements of other courts are based on a different view of the function and authority of the Code in their respective States, they are simply not relevant to the Maryland situation. MLRPC constitutes a statement of public policy by the only entity in this State having the Constitutional authority to make such a statement, and it has the force of law. The mere fact that lawyers may be disciplined—even disbarred—for violating those rules attests to the legal significance of the rules. We thus share the view of the Illinois Supreme Court, expressed in *In re Vrdolyak,* 137 Ill.2d 407, 148 Ill.Dec. 243, 248, 560 N.E.2d 840, 845 (1990), that "[a]s an exercise of this court's inherent power over the bar and as rules of court, the Code operates with the force of law." *See also Succession of Cloud,* 530 So.2d 1146, 1150 (La.1988) ("The standards in the Code of Professional Responsibility which govern the conduct of attorneys have the force and effect of substantive law"); *Citizens Coalition for Tort Reform, Inc. v. McAlpine,* 810 P.2d 162 (Alaska 1991).

The real issue here, however, is not the general quality or legal significance of MLRPC, but rather the extent to which it is enforceable outside the disciplinary context—the extent to which it, and Rule 1.5(e) in particular, governs private agreements entered into by lawyers. This Court, and indeed most courts, have given effect to at least some of the rules embodied in the Code outside the disciplinary context. In *Advance Finance Co. v. Trustees,* 337 Md. 195, 652 A.2d 660 (1995), for example, we applied MLRPC Rule 1.15 in determining that a lawyer was a fiduciary for purposes of sustaining a claim against the Client Security Trust Fund. In *Harris v. Baltimore Sun,* 330 Md. 595, 625 A.2d 941 (1993), an action under the Public Information Act, we applied Rule 1.6 (Confidentiality of Information) to determine whether the Public Defender, as an attorney, had an obligation to release

information relating to one of his clients under that Act. In *Prahinski v. Prahinski*, 321 Md. 227, 241, 582 A.2d 784, 791 (1990), we applied Rule 5.4(b) and (d), precluding a lawyer from forming partnerships for the practice of law with persons who are not lawyers, in holding that a non-lawyer spouse "has no interest in the lawyer-spouse's practice and therefore the goodwill of the practice may not be included as marital property." In *Harris v. Harris*, 310 Md. 310, 529 A.2d 356 (1987), the trial court in a worker's compensation case disqualified the claimant's lawyer on the ground that his continued representation would be in violation of MLRPC Rule 3.7, which precludes a lawyer from acting as advocate in a case in which the lawyer is likely to be a necessary witness. Though dismissing the appeal as non-allowable from the interlocutory pretrial order, we stated that "in further proceedings in this case counsel's conduct will be governed by Rule 3.7 . . . ." *Id.* at 320, 529 A.2d at 361. *See also Medical Mutual v. Evans*, 330 Md. 1, 32, 622 A.2d 103, 118 (1993). In *Cardin v. State*, 73 Md.App. 200, 533 A.2d 928 (1987), the Court of Special Appeals held that the violation by a lawyer charged with theft of former Disciplinary Rule 2–107—the predecessor of MLRPC Rule 1.5(e)—could be considered by the jury in determining whether the lawyer had criminal intent in receiving the funds alleged to be stolen. The Court of Special Appeals and the U.S. District Court for the District of Maryland have applied MLRPC Rules 1.7 and 1.9 (Conflict of Interest) in determining whether to strike the appearance of counsel in collateral litigation. *Tydings v. Berk Enterprises*, 80 Md.App. 634, 565 A.2d 390 (1989), *Gaumer v. McDaniel*, 811 F.Supp. 1113 (D.Md.1991); *Blumenthal Power Co., Inc. v. Browning–Ferris, Inc.*, 903 F.Supp. 901 (D.Md.1995); *Buckley v. Airshield Corp.*, 908 F.Supp. 299 (D.Md.1995).

In *Succession of Cloud, supra*, 530 So.2d 1146, the Louisiana Supreme Court invalidated the transfer of property by a client to her lawyer on the ground that the transfer ran afoul of the ethical rule precluding a lawyer from acquiring a proprietary interest in the client's cause of action. At 1150, the court held:

"The disciplinary rules are mandatory rules that provide the minimum level of conduct to which an attorney must conform without being subject to disciplinary action. When an attorney enters into a contract with his client in direct and flagrant violation of a disciplinary rule and a subsequent civil action raises the issue of enforcement (or annulment) of the contract, this court, in order to preserve the integrity of its inherent judicial power, should prohibit the enforcement of the contract which directly contravenes the Code adopted by this court to regulate the practice of law."

More to the point, courts have applied Code provisions dealing with fee sharing between lawyers in deciding upon the validity and enforceability of fee-sharing agreements. In *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294 (7th Cir.1995), the Seventh Circuit Court of Appeals, applying Illinois law, held an oral modification of a fee-sharing agreement between two lawyers unenforceable because Rule 1.5 of the Illinois counterpart to MLRPC required such agreements to be in writing and approved by the client. *See also Holstein v. Grossman*, 246 Ill.App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d 1224 (1993); *Kaplan v. Pavalon & Gifford*, 12 F.3d 87 (7th Cir.1993). In *O'Hara v. Ahlgren, Blumenfeld & Kempster*, 158 Ill.App.3d 562, 110 Ill.Dec. 702, 511 N.E.2d 879 (1987), the court declared an agreement by a deceased lawyer's widow to sell her husband's good will to a law firm in exchange for a share of the fees earned by the firm from the husband's clients "in stark violation of the Illinois Code of Professional Responsibility which precludes the splitting or sharing of fees between a lawyer or law firm and a nonlawyer with certain exceptions not applicable to this case," and therefore unenforceable. *Id.* at 704, 511 N.E.2d at 881.

Illinois is not alone in applying fee-sharing provisions of the Code to private agreements between lawyers and declining to enforce fee-sharing contracts in violation of those provisions. In *Scolinos v. Kolts*, 37 Cal.App.4th 635, 44 Cal.Rptr.2d 31 (Cal.Ct.App.1995), the California court held a fee-sharing agreement between lawyers invalid because it contravened an ethical rule requiring that such agreements be approved in

writing by the client. At 640, 44 Cal.Rptr.2d 31, the court observed that "[i]t would be absurd if an attorney were allowed to enforce an unethical fee agreement through court action, even though the attorney potentially is subject to professional discipline for entering into the agreement." *See also Altschul v. Sayble*, 83 Cal.App.3d 153, 147 Cal.Rptr. 716 (Cal.Ct.App.1978) and *Kallen v. Delug*, 157 Cal.App.3d 940, 203 Cal.Rptr. 879 (Cal.Ct.App.1984) (refusing to enforce fee-sharing agreements in violation of Code of Professional Conduct).

In *Matter of P & E Boat Rentals, Inc.*, 928 F.2d 662 (5th Cir.1991), the Fifth Circuit Court of Appeals, applying Louisiana law, refused to enforce an alleged agreement between a referring attorney and an attorney who did most of the work on the case to share fees equally, affirming instead a division on a *quantum meruit* basis, on the ground that, to do otherwise would violate the Louisiana Code of Professional Conduct. The Alaska Supreme Court refused to enforce a fee-sharing agreement between lawyers because it violated an ethical requirement that the client be advised of the participation of the attorneys involved. *Matter of Estate of Katchatag*, 907 P.2d 458 (Alaska 1995). In *Belli v. Shaw*, 98 Wash.2d 569, 657 P.2d 315 (1983), the Washington Supreme Court refused to enforce a fee-sharing agreement that violated that State's counterpart of MLRPC Rule 1.5(e), both because the client had not approved the agreement and because the referring attorney had done little or no work on the case. Applying Ohio law, a U.S. District Court declined to enforce an agreement to share a fee on an 80/20 basis when the evidence showed that the lawyer seeking the 20% share played "only an incidental role" in the underlying litigation and that the other firm "expended tremendous resources in taking the case to trial and beyond." *Dragelevich v. Kohn, Milstein, Cohen & Hausfeld*, 755 F.Supp. 189, 194 (N.D.Ohio 1990). The issue, it said, was "whether a fee-splitting agreement between attorneys is enforceable when the actual contribution of an attorney in the case differs substantially from the proportion of fees to which he would be entitled under the agreement."

That issue, the court held, was "governed" by the applicable provision of the Ohio Code of Professional Responsibility. *Id.* at 191.

Although, for reasons shortly to be described, we do not necessarily agree with the ultimate results reached in each of the cases just cited, we do adopt the premise emanating from those cases that MLRPC Rule 1.5(e) does constitute a supervening statement of public policy to which fee-sharing agreements by lawyers are subject, and that the enforcement of Rule 1.5(e) is not limited to disciplinary proceedings. It *may* extend to holding fee-sharing agreements in clear and flagrant violation of Rule 1.5(e) unenforceable, for, following the observation of the California court in *Scolinos v. Kolts, supra,* 37 Cal.App.4th at 640, 44 Cal.Rptr.2d 31, it would indeed be at least anomalous to allow a lawyer to invoke the court's aid in enforcing an unethical agreement when that very enforcement, or perhaps even the existence of the agreement sought to be enforced, would render the lawyer subject to discipline.

We highlight the word "may" for a reason. Although a fee-sharing agreement in violation of Rule 1.5(e) may be held unenforceable, the Rule is not a *per se* defense, rendering invalid or unenforceable otherwise valid fee-sharing agreements because of rule violations that are merely technical, incidental, or insubstantial or when it would be manifestly unfair and inequitable not to enforce the agreement. The Scope note that introduces MLRPC makes clear that the Rules are "rules of reason" that are partly obligatory, partly disciplinary, and partly constitutive and descriptive. It goes on to point out:

"Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."

■■ As the Minnesota court observed in *Christensen v. Eggen,* 562 N.W.2d 806 (Minn.App.1997), although the Code constitutes a statement of important public policy, a court ought not to strike down an otherwise valid fee-sharing agreement "merely because of a minor technical deficiency with respect to the professional rules." *Id.* at 811. This Court has expressed the same view, albeit in a different context. *See Maryland Fertilizing and Manufacturing Co. v. Newman,* 60 Md. 584, 588 (1883): "Parties have the right to make their contracts in what form they please, provided they consist with the law of the land; and it is the duty of the Courts so to construe them, if possible, as to maintain them in their integrity and entirety." *See also Webster v. People's Loan, Etc. Bank,* 160 Md. 57, 61, 152 A. 815, 817 (1931); *Mortgage Inv. v. Citizens Bank,* 278 Md. 505, 509, 366 A.2d 47, 49 (1976). In more direct accord with *Christensen, see Watson v. Pietranton,* 178 W.Va. 799, 364 S.E.2d 812 (1987); *Breckler v. Thaler,* 87 Cal.App.3d 189, 196, 151 Cal.Rptr. 50 (Cal.Ct.App.1978) ("Attorneys should be permitted to agree in advance what division of fees there will be, so long as they make a good faith attempt at the time of agreement to anticipate the proportions of services to be performed and responsibilities to be assumed, and otherwise comply with [the applicable rule]" ).

■■ When presented with a defense resting on Rule 1.5(e), the court must look to all of the circumstances— whether the rule was, in fact, violated, and, if violated (1) the nature of the alleged violation, (2) how the violation came about, (3) the extent to which the parties acted in good faith, (4) whether the lawyer raising the defense is at least equally culpable as the lawyer against whom the defense is raised and whether the defense is being raised simply to escape an otherwise valid contractual obligation,[6] (5) whether the viola-

---

6. In this regard, we note the view of the Delaware Supreme Court, expressed in *Potter v. Peirce,* 688 A.2d 894, 897 (Del.1997): "As a matter of public policy, this Court will not allow a Delaware lawyer to be rewarded for violating Delaware Lawyers' Rule of Conduct 1.5(e) by using it to avoid a contractual obligation." *See also Freeman v. Mayer,* 95 F.3d 569 (7th Cir.1996), applying Indiana law.

tion has some particular public importance, such that there is a public interest in not enforcing the agreement, (6) whether the client, in particular, would be harmed by enforcing the agreement, and, in that regard, if the agreement is found to be so violative of the Rule as to be unenforceable, whether all or any part of the disputed amount should be returned to the client on the ground that, to that extent, the fee is unreasonable, and (7) any other relevant considerations. We view a violation of Rule 1.5(e), whether regarded as an external defense or as incorporated into the contract itself, as being in the nature of an equitable defense, and principles of equity ought to be applied.

As we indicated, having declared Rule 1.5(e) inapplicable, the circuit court never considered these matters. It must now do so.

**JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.**

RODOWSKY, J., concurs.

ELDRIDGE and CHASNOW, JJ., dissent.

RODOWSKY, Judge, concurring.

I join in the opinion of the Court, but I write separately to address further possible issues on remand.

On remand, Bregman presumably will argue that he is entitled to summary judgment on the facts and the law, as the latter is set forth in the opinion of the Court. In support of such a motion, or renewed motion, the analysis of the facts in the dissenting opinion of Judge Chasanow will undoubtedly be presented by Bregman.

If Post's defense survives summary judgment, then I believe that *Adams v. Manown*, 328 Md. 463, 615 A.2d 611

(1992), becomes relevant. One of the considerations under the opinion of the Court, "if the agreement is found to be so violative of the Rule as to be unenforceable," is "whether all or any part of the disputed amount should be returned to the client on the ground that, to that extent, the fee is unreasonable." 349 Md. 142, 170, 707 A.2d 806, 819 (1998). The client, Stanley Taylor, however, is not a party to this action.

In *Adams v. Manown* the appeal was from a judgment as to which the trustee in bankruptcy of the judgment holder was the real party in interest, but the trustee was not a party. *Adams*, 328 Md. at 477, 615 A.2d at 618. In remanding the case we directed the trial court to send notice to the bankruptcy trustee and give the trustee an opportunity to intervene. *Id.* at 481, 615 A.2d at 619–20.

Here, if Post is successful on the merits in his defense, it does not necessarily follow that he keeps, for his own account, the portion of the fee claimed by Bregman. Because one possible outcome is that the client is entitled to some or all of the disputed fee, the circuit court may deem it appropriate for the court to give notice to the client and an opportunity to intervene, similar to the procedure approved in *Adams*.

CHASNOW, Judge, dissenting, in which ELDRIDGE, Judge, joins.

I respectfully dissent. In a case where summary judgment was properly granted, the Court reverses the granting of a motion for summary judgment and remands to apply a vague and problematic "equitable" test fashioned by the Court.

## THE TRIAL JUDGE DID NOT ERR IN GRANTING SUMMARY JUDGMENT

In the trial court, attorney Alan Post contended that, in order for attorney Douglas Bregman to recover 13% of the fee as provided in a fee sharing agreement, Bregman had to establish compliance with Maryland Rule of Professional Conduct 1.5(e) by proving the 13% was in proportion to the legal

services performed by him. In his response to Bregman's motion for summary judgment, Post makes his position clear:

"The Maryland Rules of Professional Conduct prohibit [Post] from ratifying conduct which [Post] reasonably believes to be in violation of the Rules. [Bregman and his firm] have refused to provide [Post] with any evidence to support the division of fees claimed. [Post] has not attempted to avoid any obligation to [Bregman], but has, in response to [Bregman's] failure to provide any evidence to support the division of fees claimed, properly requested that this Court review the facts and circumstances, and declare whether [Bregman's] claim is lawful."

Post goes on to set out what he contends are the issues in the case and complains that Bregman has not addressed those issues. He explains:

"In their Memorandum of Law, [Bregman and his firm] have failed to address the issue which the Court has been asked to address, is the division of fees claimed in proportion to the services performed by [Bregman] as required by Rule 1.5(e). [Bregman and his firm] have also failed to address the possible secondary issue, should [Bregman's] violation of Rule 1.5(e) of the Maryland Rules of Professional Conduct bar [Bregman's] enforcement of the December 20, 1991, agreement to obtain the division of fees claimed."

At the hearing on the cross motions for summary judgment, Post's attorney continued to press his contention that it would be unethical to enforce Bregman's contractual claim unless as a condition precedent to recovery Bregman proves that his claim for 13% of the fee is in proportion to the legal services he performed for the client.

"[POST'S COUNSEL]: We are seeing it as a condition precedent to payment of the fee; we are not seeing it as a defense to the claim for a fee, all right? And therefore, there is a difference.... I did a lengthy, exhaustive research in several of the best law libraries in this city, and I was not able under any reporter, any state bar reporter, or any published document whatsoever, to find any case deal-

ing with this particular provision of the Rules of Professional Conduct, either in its current form or in its original model Code form.

So I think this is not an area that has been heavily dealt with by the members of the Bar. I understand that certain jurisdictions see this as a civil matter, not an ethical matter.....

So it is something that I think that my client is entitled to ask what he asked. I mean, under the Declaratory Judgment Act he is entitled to ask for it. And again, it is not offered as a defense for a claim for a fee; it is offered for a condition precedent to deciding what that fee should be...."

Post apparently acknowledged that he could find little support for his somewhat novel contention that it would be an ethical violation to pay the contractual fee demanded by Bregman unless as a condition precedent to recovery Bregman proves that his contractual percentage fee is proportionate to the percentage of work he actually performed on behalf of the client.

Post's defense to Bregman's claim was perhaps limited because his argument was fraught with pitfalls. Post could not argue that Bregman's 13% share was unethical at the time of contracting because Post initiated the agreement, and Bregman merely accepted Post's written proposal. Post could not seriously contend that Bregman breached any implied duty to do additional work after the present fee agreement since Bregman could not initiate work not delegated to him by lead counsel, and it was stipulated that Bregman did all work assigned to him. Also, if Post was claiming that his December, 1991 seemingly unconditional promise to pay Bregman 40% of one-third of any fee was unenforceable because Bregman failed to do a proportionate (13%) share of the work, Post bears the burden under traditional contract law to establish that Bregman breached the contract. *Glen Alden v. Duvall,* 240 Md. 405, 422, 215 A.2d 155, 167 (1965). Post could not prove Bregman's efforts did not constitute 13% of the legal

services since it was stipulated Post kept no time records, lead counsel who settled the case kept no time records, and a firm that did a considerable portion of the work received no part of the fee. Similarly, the burden of proving that a contract is unreasonable or unethical should be on the party asserting this defense. *Cf. Sears v. Polan's,* 250 Md. 525, 534, 243 A.2d 602, 607–08 (1968); *Gingell v. Backus,* 246 Md. 83, 90, 227 A.2d 349, 352–53 (1967); *Bernstein v. Real Estate Comm.,* 221 Md. 221, 231, 156 A.2d 657, 662 (1959).

The trial judge, in his oral opinion, held that there was a contract to pay Bregman 13% of the fee, that the contract was proposed by and prepared by Post, that Bregman did work on Taylor's case, and even if it is assumed that Bregman did not do exactly 13% of the work so that there may theoretically be an ethical violation, it would not constitute a defense to the contract based on the undisputed evidence in the instant case. The judge stated in part:

"There is no question that the contract, the December 20th letter—there is no question of its existence, of who wrote it, of the fact that it was agreed to, and there is, of course, no question of the fact that the money has not been paid.

So that leaves us with the third question, which is really brought by way of [Post's] first request of the Court, which is that there *either is or may be an underlying ethical problem, and that because of that, that problem needs to be resolved.* In fact, [Post] uses the word, or the phrase 'condition precedent.'

*That problem, or the resolution of that problem, is a condition precedent to whether or not [Bregman] should be entitled to consummate his claim for breach of contract.*

It is my belief, based upon the motions and memorandums that have been supplied, that that ethical question is not a defense to a breach of contract between the parties. It seems to me that there is no party that suggests that

there is. There is substantial law outside of Maryland that suggests that it is not.

But in addition to that, it doesn't make sense to me to be able to raise that as a defense to a breach of contract, that one of the parties—in this case, one of the lawyers—not only entered into, but in this case made the proposal himself.

So *I don't believe that the ethical argument that is made by [Post], even if there is an ethical violation, is a defense to this suit or the claim for a breach of contract,* and that being the case, it seems to me there is no other reason why the Motion for Summary Judgment on the part of [Bregman] should not be granted."

The trial judge was absolutely correct. Post was insisting Bregman could not recover unless, as a "condition precedent," Bregman proved that there was no ethical violation by proving he did 13% of the work. The trial judge disagreed with this contention and held that, even if there might be a Rule 1.5(e) ethical violation because Bregman did not prove he did precisely 13% of the work, such a violation should not be a defense in the circumstances of the instant case where Post proposed paying Bregman 13% of the fee knowing the amount of work Bregman had done already and knowing the case was about to be turned over to another lead counsel who might not, and did not, demand any further work by Bregman. At the time of the fee agreement of December, 1991, there was an existing contract to pay Bregman 25% of the fee. The new fee division contract reduced Bregman's percentage. At that point, Bregman had already done enough work to make Post's promise of 13% of any fee a reasonable enforceable fee contract even without proof that when the client's case was finally concluded Bregman's 13% fee was precisely "in proportion to the services performed by each lawyer."

Some of the facts considered by the trial judge when granting summary judgment were admitted by Post in pleadings and documents he filed in the instant case. They included the fact that Bregman first met with the client, Taylor, and

then introduced Taylor to Post. In several letters Post acknowledged that Bregman was the referring attorney for the worker's compensation and tort cases.[1] Bregman also contributed two thousand dollars toward expenses for the Taylor litigation. In late 1990, Bregman arranged for an associate to participate in the preparation of an amended complaint and certain preliminary discovery matters. That associate worked on the case until April 1991. Other facts are undisputed since they are contained in amended affidavits filed by Bregman, which were the only affidavits in support of the motion for summary judgment that were in proper form and based on personal knowledge, and thus, the only affidavit properly considered by the circuit court. One of Bregman's affidavits alleges that:

> "At the request of Mr. Post, my firm rendered a wide array of legal services to Mr. Stanley W. Taylor, which included: meeting with and interviewing the client, developing legal theories for the actions against the defendants, investigating potential defendants, drafting numerous pleadings (*e.g.*, the Complaint, interrogatories, answers to interrogatories), appearing in court, attending a deposition, meeting with co-counsel to discuss case strategy, conducting legal research, reviewing pleadings, speaking with [opposing] counsel, and receiving, reviewing, and organizing voluminous pleadings, records, faxes, and federal expressed and/or hand-delivered documents from all counsel.

---

1. The trial judge did not decide whether the fee sharing agreement was also enforceable because Bregman had joint responsibility for the representation. Post contended there was a potential factual issue about whether the client had consented to joint representation. The majority makes reference to an affidavit by the client Taylor albeit noting that the affidavit could not be considered because it did not recite that it was based on personal knowledge. Taylor's affidavit also may be questionable because at the motions hearing Post's attorney informed the trial judge "Mr. Taylor, quite frankly, was very ill during the portion of this, after the time the cases were actually filed. He has no recollection whatsoever. He recollects a lot of different people, and a lot of people involved in this case, but he has no recollection of Mr. Bregman at all."

\* \* \*

Throughout the Taylor case, my firm continued in its role as counsel of record, receiving all of the hundreds of pleadings and papers filed by both sides. My firm, specifically myself and an associate, stayed up-to-date and prepared to get more deeply involved in the Taylor case at any time."

These were the only affidavits that could be considered by the trial judge as evidence in the motion for summary judgment, and it was never controverted by any legally sufficient affidavit. In addition, in Post's second amended complaint for declaratory relief, Post acknowledges Bregman attended a deposition and court hearing in the tort suit.

There are also several relevant stipulations entered into by the parties that were properly considered by the trial judge when deciding the motion for summary judgment. Some of those stipulations were:

"Throughout the Taylor litigation, Mr. Bregman was listed on the pleadings in the Taylor litigation as co-counsel of record for Mr. Taylor.

\* \* \*

The Post firm has no accounting of its time spent on the Taylor litigation.

The Nace firm made no accounting of its time spent on the Taylor litigation to the Post firm.

The Post firm made no accounting of its time spent on the Taylor litigation to the Nace firm.

The Bregman firm participated in the drafting of the original Complaint filed in the Taylor litigation.

The original Complaint filed in the Taylor litigation listed Mr. Bregman as co-counsel for Mr. Taylor.

On or about October 4, 1990, Mr. Taylor was provided a copy of the original Complaint filed in the Taylor litigation.

* * *

The Bregman firm participated in the drafting of the Amended Complaint filed in the Taylor litigation.

* * *

The Amended Complaint filed in the Taylor litigation listed Mr. Bregman as co-counsel for Mr. Taylor.

On or about April 24, 1991, Mr. Taylor was provided a copy of the Amended Complaint filed in the Taylor litigation.

* * *

Mr. Bregman was included in the final version of the Official Service List provided to the Clerk of the Court on or about February 21, 1992.

* * *

At no time during the course of the Taylor litigation was the Bregman firm assigned any task that it did not properly perform.

* * *

The Simon firm was lead counsel for Mr. Taylor from the commencement of the Taylor litigation until Mr. Simon withdrew his appearance in the matter."

There are several reasons why the trial judge properly rejected Post's "ethical" argument that Bregman should not collect his contractual 13% of the fee unless as a condition precedent he proves he did 13% of the work. First, none of the firms that worked on the case kept time records so it would be almost impossible to prove the proportion Bregman's efforts bore to the efforts of Post and the other attorneys in the case. Second, Ron Simon of the Connerton firm was lead counsel during a substantial portion of Taylor's tort litigation, from the period before Taylor's tort suit was filed until over a year after suit was filed. That firm withdrew *before* the current Post–Bregman fee sharing contract; Simon and his firm got no fee for the work they did in the case so if Post

prevails, presumably he would also keep the full percentage of the fee attributable to Simon's work. Third, basic contract law is inconsistent with Post's "ethical" defense. To the extent that Post was actually asserting that the contract should not be enforced because it was unethical or that Bregman somehow breached the contract, then the burden of proof was on Post to prove those assertions. Fourth, the amount of work done by Bregman at the time of the current fee division contract could be reasonably estimated to be 13% of the legal work that would be done in the client's case. Post should not be able to shift the almost insurmountable burden of proving the proportion of work done by each attorney to Bregman by claiming it would be unethical for him to divide his portion of the fee with Bregman unless Bregman first proves the contractual division is "ethical."

There is also a fairly recent case in this Court that is not cited by the majority, but was cited to the trial judge, and that case may have been a basis for the trial judge's holding in the instant case. In *Vogelhut v. Kandel*, 308 Md. 183, 517 A.2d 1092 (1986), plaintiff attorney was representing a client who, without good cause, discharged plaintiff attorney and retained defendant attorney. After defendant wrote to plaintiff and asked for the client's files, the two attorneys came to an agreement that the discharged attorney would get 25% of the 40% contingent fee the client agreed to pay the defendant attorney. When the case settled, the defendant attorney refused to pay plaintiff attorney anything more than *quantum meruit* based on an hourly rate. Plaintiff attorney filed suit against defendant attorney to collect the contractual 25% of the fee, and a bench trial was held. The record extract contains testimony of the defendant attorney that he expended from between 300 to 350 hours on the case, but the plaintiff attorney testified he could not give even an estimate of the number of hours he worked on the case because his office kept no time records.

The trial judge in *Vogelhut* acknowledged he was faced with a situation where the party seeking to enforce the fee splitting contract could not prove what proportion of the total legal

services he performed, but the judge, nevertheless, entered judgment for the plaintiff for $18,700 which represented the contractual 25% of the fee received by the defendant attorney. The trial judge concluded there was an agreement reached and the agreement was enforceable even without proof that the contractual fee split was proportionate to the work done. On appeal the contention was that "the agreement ... [was] one violating the Code of Professional Responsibility, since it constituted unethical fee splitting in violation of DR 2–107 and resulted in an excessive fee prohibited by DR 2–206 to appellee considering his ['modest'] legal services to [the client]." *Vogelhut v. Kandel,* 66 Md.App. 170, 178, 502 A.2d 1120, 1124 (1986). The Court of Special Appeals affirmed the trial court's judgment. *Vogelhut,* 66 Md.App. at 180, 502 A.2d at 1125. We granted certiorari. One of the issues to be resolved was:

> "Is a discharged lawyer ethically precluded from sharing the fee of his successor, either not in proportion to the value of services, or in the absence of the client's consent?"

308 Md. at 188, 517 A.2d at 1095. This Court affirmed the ruling of the trial judge, holding that because there was not concurrent representation of the client and because the client was not adversely affected by the fee sharing agreement, the ethical rules were not violated. Neither the majority nor the concurring opinion apparently found any impediment to enforcing the discharged attorney's contractual claim to 25% of the fee without proof that he did 25% of the legal work on the case.

## DIVIDING CONTINGENT FEES

Pursuant to Rule 1.5(e), a proper contract to divide a contingent fee among lawyers who work on a contingent fee case should be a division in approximate proportion to the work each lawyer did or expects to do on the case. The reasonableness of contingent fee contracts with the client and contracts dividing a contingent fee among the attorneys normally should be judged on the reasonableness of the percentage agreed on at the time of contracting, not on whether the

attorneys put in more or less work than anticipated to win the case and not whether the recovery was more or less than anticipated. "Courts have generally stated that the reasonableness of a contingency fee contract should be looked at in light of the factors as they existed at the time the contract was entered into, but this must be qualified by the inherent power of a court to review fees in the case before it." 1 Robert L. Rossi, Attorneys' Fees § 2:9, at 111–12 (2d ed.1995).

A contingent fee contract is by its nature something of a gamble on the strength of the client's case and the skill of the attorneys. If there is no recovery for the client the attorney gets no fee regardless of the amount of work he or she performed on behalf of the client. If the client has to compromise and receives only a small recovery the attorney gets only the agreed on percentage regardless of the efforts expended. On the other hand, if the case settles for a great deal of money shortly after the attorney is retained, the attorney receives the agreed on contingent fee even though relatively little work was done on the case. As long as the contingent fee division contract was not proven to be unreasonable or unethical when entered into, each attorney ordinarily should get the agreed contractual division. Merely speculating that the fee division might be unreasonable or unethical by recomputing the proportionate division of efforts after the client's case is settled should not be a defense to a suit on the contract.

This contract initiated by Post promised Bregman 13% (40% of one-third) of any fee recovered. It was not shown to be an unreasonable or unethical division of the potential fee when it was entered into. There was no suggestion by Post that the contract was coercive, improper or unethical when entered into. Post obviously thought at the time of contracting that Bregman deserved 13% of any fee since Post was the one who proposed that division. Our ethical focus should be on whether the contract was proper and ethical when entered into, not through hindsight based on fortuitous events that occurred later.

In an analogous situation, let us assume that an attorney agrees to represent a client in a difficult personal injury action and does considerable work on the client's case. As the case gets close to trial, the attorney, with the full agreement of the client, decides to bring in a much more skillful and experienced trial attorney. The two attorneys carefully compare the amount of work the referring attorney has already done and the work the new attorney can reasonably be expected to do and mutually agree it would be reasonable and proportionate to divide the one-third contingency fee equally between them. That agreement to equally divide the fee ought to be enforceable as long as both attorneys do everything they are supposed to do on behalf of the client. It should not matter whether the case settles shortly after the being turned over to new the trial attorney and the original attorney has done the majority of the work or whether the new trial attorney in preparing for and trying the case and its appeal expends more effort than either party thought would be necessary. Like the original contingent fee contract with the client, normally the validity of the fee sharing contract should be judged on the facts at the time the contract was made.

This is in accord with what this Court held in *Mortgage Inv. v. Citizens Bank,* 278 Md. 505, 510, 366 A.2d 47, 50 (1976), a case where a note provided for an attorney's fee of 15% of recovery. When the note was not paid, suit was filed and judgment was entered for the amount due on the note as well as over $150,000 in attorneys' fees representing 15% of the amount judgment. On appeal the primary contention was that the judgment for attorneys' fees was grossly excessive based on the amount of legal work necessary to file suit on the note. This Court recognized that it had to reconcile several doctrines including "first, the inherent power of a court to oversee the activities of members of its bar ... [and] second, the rights of parties to make such contracts as they please, so long as they are consistent with law." 278 Md. at 508–09, 366 A.2d at 49 (citations omitted). This Court upheld the fee because the agreement was one entered into by informed and sophisticated contracting parties, and it should be enforceable even

though ultimately the amount due at the time of suit made the 15% attorneys' fee unreasonably high. We stated:

"While the amount of the collection fee may be regarded as grossly disproportionate to the amount of work involved, it must be remembered that [the defendant] was an informed and sophisticated borrower, entirely familiar with banking practices."

278 Md. at 510, 366 A.2d at 50.

The single dissenting judge made an argument similar to that made by Post in the instant case. The dissenting judge, although perhaps not accurately characterizing the majority opinion, complained that:

"The Court tacitly concludes that a contract provision providing for an attorney's fee should be treated in the same manner as any other provision in a contract; for example, an attorney's fee provision is void only if there is clear evidence of overreaching. I believe, however, that provisions for attorneys' fees fall in a separate category because of our supervisory role over attorneys, who are, after all, officers of the Court. The majority, of course, recognizes that because attorneys are officers of the Court, the Court possesses the power to uphold the highest standards of professional conduct and to protect the public from imposition by the practitioner. This power should be exercised when necessary to merit 'the respect and confidence of ... the society which (an attorney) serves.' American Bar Association, Code of Professional Responsibility, Preamble (1975). Achievement of this objective compels, in circumstances such as are present here, special treatment for contracts for attorneys' fees.

The Code of Professional Responsibility provides the touchstone against which we should measure an attorney's conduct:

'(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or *clearly excessive* fee.

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a

definite and firm conviction that the fee is *in excess of a reasonable fee....*' Code of Professional Responsibility, Disciplinary Rule 2–106(A), (B), Maryland Rules App. F (emphasis added).

These rules are mandatory in character and state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. American Bar Association, Code of Professional Responsibility, Preliminary Statement (1975). *The majority apparently would permit attorneys to collect excessive fees, while not permitting them to enter into unconscionable agreements for excessive fees.* I doubt that the public will draw such fine distinctions in assessing its confidence in attorneys." (Emphasis added).

*Mortgage Inv.,* 278 Md. at 511–12, 366 A.2d at 50–51. In *Mortgage Inv.,* we recognized that ordinarily when a question is raised about the reasonableness of a contingent fee contract the relevant period is the time of contracting. The contract initiated by Post to give Bregman 13% (40% on one-third) of any fee recovered was not shown to be other than a reasonable attempt to ethically divide the contingent fee. Absent special circumstances not present in the instant case, our ethical evaluation of a fee division contract should be based on whether the contract was proper and ethical when entered into, not based on fortuitous events that occurred after the contract. There was no claim that Bregman breached his contract, and he should not be required to "ethically" justify his contractual claim by proving the percentage of the work he actually performed equaled his percentage of the fee.

Many of the cases cited by the majority in support of its position are referral fee cases where a fee was claimed by an attorney who did nothing more than refer a case. States are not in agreement about whether there should be a public policy against charging a fee for doing nothing more than referring a case to another attorney. *See* Caroll J. Miller, Annotation, *Validity and Enforceability of Referral Fee Agreement Between Attorneys,* 28 A.L.R.4th 665 (1984). Had this been a contract to pay Bregman a substantial portion of

the contingent fee for merely referring the case, the contract itself might have been unethical and thus unenforceable. That issue, however, need not be decided in the instant case. Where a lawyer who has worked on a case gets permission from the client to refer the case to another lawyer to handle the trial and the two attorneys agree on a reasonable division of the contingent fee, normally the agreement should be enforceable unless at the time the agreement was entered into it contemplated an unethical split. That is what we held in *Vogelhut,* and it is what we should hold in the instant case. Referral of cases can often benefit the client and referral agreements should not be considered improper where the referring attorney has performed work on the client's case and the contracting attorneys agree that the fee division approximates the proportion the work done by the referring attorney bears to the work anticipated to be done by the trial attorney.

When a client comes to an attorney with a case that will potentially generate a very large fee, most attorneys will be reluctant to turn down the case. Cases that potentially can result in very large contingent fees generally will be vigorously opposed by highly competent counsel and often require extraordinary skill and expertise. An attorney who takes such a case and comes to realize the client might be better served by another attorney with greater skill or experience should be not be discouraged from referring the case to another attorney better able to champion the client's cause. Common sense tells us that attorneys would be reluctant to refer cases that will potentially result in contingent fees amounting to hundreds of thousands of dollars in exchange for *quantum meruit* payments for services rendered at an hourly rate. Public policy should permit a referring attorney to share in the risk of no recovery or the reward of a very large recovery as long as the fee sharing agreement is reasonable when entered into and does not adversely affect the client. That is not to suggest that highly disproportionate division of contingent fees would be permitted merely because one attorney referred the case to another. It does suggest, however, that where the referring attorney has done some work and the

referring attorney as well as the new lead counsel have come to an agreement on division of a contingent fee, courts should assume both attorneys have acted ethically and arrived at a proportionate division of fees, recognizing that at the time of agreement no one is able to accurately predict how much work will be done by the new attorney or even if there will be any fee at all.

Furthermore, the attorney seeking to set aside a contingent fee sharing agreement should have the burden of proving that the agreement was unreasonable or unethical when entered into. *See* 2 ROBERT L. ROSSI, ATTORNEYS' FEES § 13:12, at 309 (2d ed.1995). Unquestionably, Post did not and could not meet such a burden of proof, even if we assume that ultimately the division might not be the precisely proportionate division that the ethical rules seem to require.

Other courts permit attorneys in Bregman's position to recover contractual fee divisions even if the fee is not exactly in proportion to the services performed.

"When faced with an agreement between attorneys to share a legal fee in a situation where the applicable rule required that the division of fees between attorneys be in proportion to the services performed by each, many courts have given a liberal construction to that requirement. Some courts have held that such an agreement is enforceable according to its terms provided that the attorney who seeks his or her share of the fee contributed some work, labor or service toward the earning of the fee. Other courts have taken only a slightly less liberal position, stating that the respective fees need not precisely correlate with the work performed by each attorney, and that the agreed fee division should be enforced where there is a substantial division of services or responsibility." (Footnotes omitted).

1 ROBERT L. ROSSI, ATTORNEYS' FEES § 4:1, at 218–19 (2d ed.1995). *See, e.g., Schniederjon v. Krupa,* 130 Ill.App.3d 656, 85 Ill.Dec. 845, 849, 474 N.E.2d 805, 809 (1985)(noting that where attorney performed some work, labor, or service, fee sharing agreement may be enforced despite fact that actual

participation in case may not have been in proportion to amount of fee claimed); *Fitzgibbon v. Carey,* 70 Or.App. 127, 688 P.2d 1367, 1374 (1984)(noting that agreement between attorneys to divide a contingency fee may be enforced "even though it is claimed that the division is not directly proportional to the work performed by each" attorney), *review denied,* 298 Or. 553, 695 P.2d 49 (1985).

## EQUITABLE PRINCIPLES

The majority, without any citation of authority, decides that an ethical violation of Rule 1.5(e) should be treated as an "equitable defense" and holds "principles of equity ought to be applied" to these ethical violations. 349 Md. 169, 170, 707 A.2d 819 (1998). The majority also holds that contracts that violate ethical rules are not *"per se "* invalid but are unenforceable unless the ethical violation is "technical, incidental, or insubstantial" or unless it would be "manifestly unfair and inequitable" not to enforce the unethical agreement. 349 Md. 168, 707 A.2d 819. This vague, amorphous "equitable" test for contract enforcement is not the law anywhere else, and is at best problematic. For example, what variance between an ethical fee and the actual contractual fee would constitute an "insubstantial" difference justifying enforcement of the unethical agreement? Can clients also use this "equitable" test to abrogate contingent fee contracts either because the case settled before the attorney had to do very much work or because the recovery was lower than the attorney and client expected? Will lead counsel be able to avoid paying the agreed upon percentage of the contingent fee to associate counsel by not assigning the same proportion of the work as associate counsel's proportion of the fee?

Although I do not subscribe to the majority's equitable principles defense, if equitable principles are going to be applied, then as a matter of law the clean hands doctrine and equitable estoppel should bar Post from challenging the fee division contract he proposed and prevent him from keeping the full one-third of the fee without having to justify his own fee by proving he did one-third of the legal work. The Court

remands the case so that Post can assert an "equitable defense" that would allow Post to keep some or all of the fee he contracted to give to Bregman even though Post proposed this fee division and Bregman did not breach the contract. That equitable defense does not seem very equitable. Where the agreement between two attorneys is proven to be an unethical division of the fee or an attempt to evade the ethical rules, both attorneys should be required to prove what they are entitled to in *quantum meruit* and neither attorney should be permitted to keep a disproportionate share of the fee. If this agreement is not enforceable then Post as well as Bregman should have to justify their percentages of the fee and any portion of the fee not justified by either attorney should go to the client and not be retained by Post. If the Court is going to remand the case to the trial court we should expressly direct that the client be made a party to the proceedings and any portion of Bregman's contractual fee not recoverable by Bregman should go to the client not to Post. It seems obvious that Mr. Simon did considerable work on the Taylor case yet he and his firm received no part of the fee. If the fee is not going to be divided in conformity with the attorneys' contracts, then Simon's proportionate share as well as Bregman's unearned share of the fee should be refunded to the client rather than being an unethical, unearned fee windfall for Post. Isn't allowing Post to keep more of the fee than he can prove he earned at least as unethical as allowing Bregman to recover more of the fee than he can prove he earned?

The trial judge did not hold that a violation of the Rules of Professional Conduct could never void a fee division agreement; the judge held that under the circumstances of the instant case Bregman's efforts on the client's behalf justified his contractual 13% of the fee even if conceivably there might have been a violation of Rule 1.5(e) because Bregman did not prove his efforts constituted 13% of the total legal work. There is no proof that the fee sharing agreement was unreasonable or unethical at the time it was entered into, and there was no proof of any breach by Bregman, so he should be entitled to enforce the agreement. Post's ethical argument

was properly held by the trial judge not to constitute a defense to Post's contract to pay Bregman 40% of one-third of the fee he received from the lead attorney. This Court should affirm the judgment entered below. I respectfully dissent.

Judge ELDRIDGE has authorized me to state that he joins in this dissenting opinion.